IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. GLR-19-0456 |
| | * | |
| WILLIAM CUNNINGHAM | * | |
| | * | |
| Defendant | * | |
| ******* | | |

**GOVERNMENT'S CONSOLIDATED RESPONSE TO
DEFENDANT'S MOTIONS TO SUPPRESS STATEMENTS AND PROPERTY**

The United States of America, by its undersigned counsel, hereby opposes Defendant William Cunningham's Motion to Suppress Property [ECF No. 17].[1] For the reasons set forth below, this Court should deny the motion.

**FACTUAL BACKGROUND**

The Government expects officers to testify as follows, supplemented by body-worn camera footage where noted. On June 12, 2019, Detectives Ragin and Healey of the Baltimore Police Department were conducting in proactive enforcement in the area of the 3400 block of Harlem Avenue in an unmarked police vehicle, though wearing vests marked "Police." Both of the detectives had years of experience working that area and know it to be plagued with high levels of drug trafficking activity and the attendant crimes of violence and gun crimes. As they approached "The Black [Convenience] Store" at the corner of Linnard Street and Harlem Avenue, they saw a man later identified as the defendant, William Cunningham, in front of a yellow Planet Aid donation box and standing with his back to them. Det. Ragin could see Cunningham taking small

---

[1] Defendant also asks the Court to suppress certain statements made by Defendant in his Motion to Suppress Statements. *See* ECF No. 17. In subsequent correspondence, defense counsel clarified the statements to which Defendant objected were those made in Sergeant Hendrichs's body-worn camera (BWC) video at 17:45, Det. Ragin's BWC video at 17:14, and Det. Healey's BWC video between 17:14:30 and 17:34:14. The Government does not seek to introduce these statements in its case in chief, and thus the motion should be denied as moot.

items of suspected[2] controlled dangerous substances (CDS) in packaging consistent with the sale or distribution of CDS, including both small colored ziplock bags and small vials, out of a small black plastic bag on the donation box and placing some on his person and some back into the bag.

Cunningham then noticed the detectives, and he immediately backed away from the bag and started walking away from the detectives.[3] But, when Det. Ragin headed towards the bag to retrieve it, Cunningham walked back towards the bag, interposed himself between the detective and the bag, retrieved it, and headed towards the store. He talked over Det. Ragin and kept nervously insisting that the bag contained "just sandwiches." Cunningham then walked inside the store and spoke with the clerk, saying something to the effect that "they [the detectives] want some of these sandwiches." He placed the bag inside a "Lazy Susan" style opening in a plexiglass window and turning it towards the cashier. Det. Ragin turned the pass-through back around to him and seized the bag.

As Det. Ragin seized the bag, Cunningham turned around and began to exit the store. Det. Ragin looked inside the bag (which was not closed) and saw the vials of cocaine and small ziplock bags of suspected marijuana. By the time he directed Det. Healey to "stop him, yo,"[4] Cunningham was already past Healey. Cunningham broke into headlong flight, and Det. Healey pursued him down the rear alley of Linnard Street; Cunningham did not obey Det. Healey's repeated commands to stop and get on the ground. Det. Healey noticed that Cunningham's left hand remained clutched throughout his flight, and Healey's BWC video likewise shows Cunningham repeatedly gripping the front and side of his right leg with his hand throughout his flight. Det. Healey was able to tackle

---

[2] Law enforcement often refer to such items as "suspected CDS" because they cannot confirm the actual presence of the banned substances until a full laboratory analysis is completed.
[3] It is at this stage that the detectives' body-worn cameras begin recording the encounter, at the 17:10:38 timestamp for Det. Ragin and 17:10:39 for Det. Healey. These initial observations are within the "buffer" period during which audio is not recorded, so the sound is not available until thirty seconds after initial activation.
[4] This is the point at which the audio becomes available, at approximately 17:11:09 on Ragin's BWC.

2

Cunningham, but he refused to give up his hands to be restrained for some time. Det. Ragin, who had locked the bag inside his car and called for backup, then assisted Det. Healey in securing Cunningham.

Both detectives noted aloud that Cunningham had a gun, which had slipped down his side during his flight and was protruding from a hole in the right knee of his pants. Det. Healey also noted that Cunningham had a pack of vials underneath him; while several were smashed by the arrest, Healey was able to recover eleven intact vials – all of which matched those in the black plastic bag – from the ground immediately around Cunningham and another one from his rear pants pocket during the search incident to Cunningham's arrest. Det. Ragin recovered the firearm, a Stallard Arms/Hi-Point JS-9mm semi-automatic pistol loaded with eight rounds of ammunition.

A final inventory of the black plastic bag revealed that it contained, among other things, forty-six black top vials containing crack cocaine; eight clear and black ziplock bags containing suspected marijuana; four larger clear and green ziplock bags containing suspected marijuana; and a black digital scale with residue. Det. Healey searched Cunningham incident to his arrest and recovered, among other things, one clear and green ziplock bag containing suspected marijuana, which matched those recovered from the black plastic bag, from his left rear pants pocket and one black top vial containing rock cocaine, which also matched those recovered from the black plastic bag, as well as those Cunningham threw underneath him during his apprehension, from his right rear pants pocket. Cunningham was treated for cuts to his hand sustained during his apprehension and then booked on state firearm and CDS charges.

## PROCEDURAL HISTORY

On September 24, 2019, a federal grand jury indicted Cunningham on one count of Possession with Intent to Distribute Cocaine, in violation of 21 U.S.C. § 841(a)(1); one count of

Possession of a Firearm in Furtherance of Drug Trafficking, in violation of 18 U.S.C. § 924(c); and one count of Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. § 922(g). ECF No. 1. He made his initial appearance on November 14, 2019, and was ordered detained on November 18, 2019. ECF Nos. 4 & 10. He was arraigned on January 17, 2020, and entered a plea of not guilty. ECF No. 15. On January 30, 2020, Cunningham filed the instant Motion to Suppress Statements and Motion to Suppress Property. ECF Nos. 16-17. The Court issued a revised scheduling order both before and after the onset of the Covid-19 pandemic, with a motions hearing currently set for October 30, 2020. ECF Nos. 19, 27, 28.

## ARGUMENT

**I.   CUNNINGHAM HAS NO STANDING TO CHALLENGE THE SEIZURE AND SEARCH OF THE BLACK PLASTIC BAG BECAUSE HE ABANDONED IT.**

**A.   Legal Standard**

To successfully challenge a search under the Fourth Amendment, a defendant must first establish that he has a reasonable expectation of privacy in the place to be searched and the thing to be seized. *Rakas v. Illinois*, 439 U.S. 128, 143. Here, Cunningham fails on this ground because he abandoned the property in question, and the Supreme Court has held that "[t]here can be nothing unlawful in the Government's appropriation of [ ] abandoned property." *Abel v. United States*, 362 U.S. 217, 241 (1960). *See also*, *United States v. Davis*, 657 F. Supp. 2d 630, 647-48 (D. Md. 2009), *aff'd*, 690 F.3d 226 (4th Cir. 2012) ("It is well established that the warrantless search of abandoned property is not unreasonable and therefore does not violate the Fourth Amendment."). The evaluation of whether the defendant intended to abandon his property is based on an objective analysis of act and intent, which intent may be inferred from "words spoken, acts done, and other objective facts." *United States v. Small*, 944 F.3d 490, 502 (4th Cir. 2019), quoting *Davis*, 657 F. Supp. 2d at 648 (internal citations and punctuation marks omitted). Finally, it must focus on the

4

information available to police at the time they performed the warrantless search. *Small*, 944 F.3d at 502, citing *United States v. Nowak*, 825 F.3d 946, 948 (8th Cir. 2016) (per curiam); *Bond v. United States*, 77 F.3d 1009, 1013 (7th Cir. 1996); and *United States v. Banks*, 540 U.S. 31, 39-40 (2003).

      **B.**    **Cunningham's First Attempt to Abandon the Property, Nervous and Evasive Behavior, Leaving the Property in the Pass Through, and Failure to Assert His Claim Over the Property All Support a Finding of Abandonment**

All the "words spoken, acts done, and other objective facts" militate in favor of finding that Cunningham cannot challenge the warrantless search of the black plastic bag because he abandoned his property. As an initial matter, and as discussed in more detail in Section II, the totality of the detectives' observations *before* Cunningham became aware of their presence objectively provided them with probable cause to arrest Cunningham and seize the bag (and search it incident to arrest). This is not a situation where they observed characteristics of an armed person or received a tip from a confidential informant; Det. Ragin actually observed Cunningham handle the illegal CDS and place it in the subject bag. Cunningham's behavior thereafter not only further supported probable cause, but it established a pattern of seeking to abandon the property to evade criminal liability.

First, once Cunningham became aware of the presence of the detectives, he immediately tried to distance himself from the contraband by abandoning it the first time on the Planet Aid box. Only once he realized the detectives were about to seize the contraband did he retake possession of the bag, despite Det. Ragin's clear indication that he was attempting to seize the bag.

Second, Cunningham did not submit to the show of authority, but rather nervously talked over Det. Ragin, stating that the bag just contained sandwiches, all while fleeing from Ragin's presence into the store.[5]

What Cunningham needed was a way to distance himself from the property but also impede the detectives' seizure, just as someone fleeing from law enforcement might throw a bag or gun over a fence; the store provided the next closest opportunity, by virtue of the plexiglass partition. Cunningham's actions make clear that the goal was not to entrust the "sandwiches" to the cashier for safekeeping but rather to impair the availability of the physical evidence to the officers and allow himself time to escape.While Defendant cites *United States v. Most*, 876 F.2d 191 (D.C. Cir. 1989) for the proposition that a store clerk holding a bag for a customer does not constitute abandonment, it is actually the details of that case that illuminate the analysis here. In that case – unlike the instant one – the permissible inferences were slight because the justification for that stop vanishingly thin: the defendant was "looking about the parking lot in a suspicious manner" and exited from the grocery story carrying a different bag. *Id*. at 192. More importantly, though, not only did that store have a policy that shoppers were required to check their bags – which converts the abandonment into a situation more akin to a bailment – but that defendant asked the clerk to watch his bag not once, but twice. *Id.* Here, there is no evidence of any such policy or request. Finally, in that case, the defendant successfully completed the transfer of custody and left the store secure that his property was being held in that explicit bailment in the usual course of business. Contrast that situation with the current one: repeated attempts to evade law enforcement

---

[5] There is no minimum speed requirement for flight, but the courts rather look at all of the contextual indicia, including those present here: a high crime area, unprovoked flight at the sight of police, and nervous and evasive behavior. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

interception of the bag, a previous explicit abandonment attempt, no explicit statements or policies of bailment, and a hurried attempt to turn the pass through to prevent interception.

Finally, if Cunningham truly meant to transfer actual possession of the bag while maintaining constructive possession, one would expect that he would reassert his possessory interest in the bag upon the unsuccessful attempt to transfer the possession to the cashier. Instead, he stood by while Det. Ragin stopped the pass through from turning and retrieved the bag. At no time does he appear to attempt to reclaim – by word or gesture – the bag; instead, he is focused on leaving the bag behind and maintaining a clear path of flight, the quintessential example of abandonment. *See, e.g.*, *United States v. Coley*, 464 F. Supp. 2d 487 (D. Md. 2006) (defendant never submitted to the detectives' show of authority and was fleeing when he discarded the gun). While Cunningham paints Det. Ragin's search of the bag as the trigger for Cunningham's flight, Cunningham was already headed toward the door when the search happened before breaking into headlong flight. Because intent is so seldom made explicit, the courts direct the parties to look at "words spoken and acts done," which includes words *not* spoken and actions *not* done. Here, Cunningham's failure re to reassert his control over the items or object to the officer's seizure of the bag when he had a clear opportunity to do so before the seizure or search was effected shows a disclaimer of possessory interest, as does the literal act of fleeing and leaving the gun behind.

   **B.**  **The Cases Defendant Cites Are All Easily Distinguishable From This Case.**

Though the abandonment inquiry is substantially dependent on a fact-intensive analysis, Cunningham cites several cases in support of his proposition that his actions do not constitute abandonment. While *Most* was discussed above, the other cases cited have equally significant differences with the instant case and are distinguishable therefrom. *Rios* dealt with a set of facts

Case 1:19-cr-00456-GLR   Document 29   Filed 09/11/20   Page 8 of 16

that totally failed to establish probable cause[6] to justify the stop; disagreement as to whether his dispossession of the bag was voluntary; and an occupied taxicab, the door of which was opened without the defendant's, which implicates different privacy interests than the instant matter. *Rios v. United States*, 364 U.S. 253 (1960). These are all dramatically different than a situation where the lawfulness of the officers' actions prior to the seizure are not challenged and are amply supported by probable cause (as detailed herein), where there is no question that Cunningham's actions were voluntary, and in a public convenience store.

In *Smith v. Ohio*, 494 U.S. 541 (1990) (per curiam), the defendant threw the property in question onto his *own* car and then turned to engage with the officers, who again appear not even to have had reasonable articulable suspicion, rather than abandoning it by trying to ditch it in a convenience store before fleeing.

The Ninth Circuit's opinion in *United States v. Jackson*, 544 F.2d 407 (9th Cir. 1976) is equally inapposite. Perhaps most significantly, even the language about the stepping away from the bag is merely part of the overall – very fact-intensive and loaded with issues relating to the underlying justification for the stop – analysis; the ultimate holding of which was that Jackson *had* abandoned the suitcase and lacked standing to object to its search. *Jackson*, 544 F.2d at 411. Moreover, the Ninth Circuit clarified its abandonment test in *United States v. Kendall*, 655 F.2d 199 (9th Cir. 1981) by adopting the reasoning of the Fifth Circuit in *United States v. Williams*, 569 F.2d 823 (5th Cir. 1978). Significantly, both in *Kendall* and *Williams*, defendants become aware of police suspicion and undertake actions to destroy or hide the evidence of those crimes. Kendall removed a baggage claim check so he could fraudulently claim there was a mismatch and Akers,

---

[6] It likely would have failed the reasonable articulable suspicion standard as well, but it was decided in 1960, eight years before the Supreme Court's articulation of that standard in *Terry v. Ohio*, 392 U.S. 1 (1968). Significantly, it was also decided before *Abel*, the landmark Supreme Court case on abandonment.

8

Kendall's co-defendant, left the airport without reclaiming the subject bag for which he had the claim check. In *Williams*, the defendant:

> . . . knew he was followed by government officers. His only conceivable purpose in leaving the trailer unguarded and unlocked in the parking area was to rid himself of the vehicle with its incriminating contents. Perhaps, he retained a hope that he might accomplish two objects: the protection of himself from possession of evidence while he was pursued, and the chance of recovery of the trailer if neither the officers nor anyone else took it. Garry Williams was just like the bank robber who having a gun, finds himself pursued, and in his hope of escaping detection throws the gun into a yard where, if it is not picked up he might retrieve it. Such conduct is transparently an abandonment of the tight grip of ownership and reliance solely on the feeble hope of re-acquisition.

*Williams*, 569 F.2d at 826 (5th Cir. 1978). In this case, Cunningham's initial abandonment of the property upon the Planet Aid box is a transparent attempt to do precisely what Williams did: upon noticing he was being followed by law enforcement, he attempted to distance himself from his property with the incriminating contents with the "feeble hope of re-acquisition." It was only when this was obviously going to fail that he reacquired the property and attempted to ditch it in the store in an area that would be less immediately accessible to officers – and give him the chance to flee – while still not being an area one in which he had a reasonable expectation of privacy.

After both considering the objective facts available to the detectives at the time of the search and seizure of the bag – his initial abandonment, his evasive and nervous actions, his attempt to distance himself from the bag while obstructing the detectives' access to it, the lack of any evidence of a bailment relationship with the cashier, his failure to reassert possessory interest, and his final flight from the store without the bag – it is clear that Cunningham abandoned the bag and thus does not have standing to object to the warrantless search of it

**II.    AMPLE PROBABLE CAUSE SUPPORTED BOTH THE SEIZURE AND SEARCH OF THE BAG, CUNNINGHAM'S ARREST, AND THE SEIZURE OF ITEMS INCIDENT TO HIS ARREST.**

    **A.    Legal Standard**

9

The underlying command of the Fourth Amendment is that all government searches and seizures must be reasonable. *Wilson v. Arkansas*, 514 U.S. 927, 931 (1995). A warrantless arrest is an unreasonable unless there is probable cause to believe that a crime has been or is being committed. *See United States v. Watson*, 423 U.S. 411, 417–24 (1976). The standard for whether probable cause exists is an objective one: when, "at the time the arrest occurs, the facts and circumstances within the officer's knowledge would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." *United States v. Garcia*, 848 F.2d 58, 59–60 (4th Cir. 1988) (internal quotations omitted). The analysis requires courts to consider the totality of circumstances. *United States v. Al–Talib*, 55 F.3d 923, 931 (4th Cir. 1995) (citing *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983)). Although probable cause must be supported by more than a mere suspicion, evidence sufficient to convict is not required. *Wong Sun v. United States*, 371 U.S. 471, 479 (1963).

    **B.**    **The Detectives' Plain View Observations Gave Rise to Probable Cause That Supported Both the Search and Seizure of the Bag and Cunningham's Arrest.**

While Defendant's motion states simply that "probable cause did not exist for Officer Ragin to search the contents of the black bag," that probable cause actually arose at the very outset of this case. ECF No. 17 at ¶8. Often cases have fact patterns like *Terry v. Ohio*, resulting from an officer's application of his or her knowledge, training, and experience to an in-depth study of a situation over some period of time. 392 U.S. 1 (1968). This case is almost the opposite; while they were informed by the knowledge, training, and experience, particularly with the drug trade in that particular area, the detectives just happened to observe a crime in progress – Cunningham's possession of the CDS – and immediately recognized the incriminating character of the items in the bag.

The plain view doctrine authorizes "warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997), *citing Horton v. California*, 496 U.S. 128 (1990); *United States v. Williams*, 41 F.3d 192, 196 (4th Cir. 1994). There is no question that, in this case, the detectives were lawfully in a place from when the objects could be plainly viewed, to wit: in their car on a public street and then in a convenience store open to the public. Likewise, they had a lawful right of access to the bag by virtue of its being abandoned in a public place. Finally, the incriminating character was immediately apparent, both upon their initial observations of Cunningham with the CDS and upon Det. Ragin's looking into the bag.

While the plain view doctrine usually addresses only an item's warrantless seizure, as distinguished from the warrantless search, courts will allow a warrantless search of a container following its plain view seizure "where the contents of a seized container are a foregone conclusion." *Williams*, 41 F.3d at 197, *quoting United States v. Corral*, 970 F.2d 719, 725 (10th Cir. 1992) (internal punctuation omitted). As the Fourth Circuit noted in *Williams*, "when a container is not closed, or transparent, or when its distinctive configuration proclaims its contents, the container supports no reasonable expectation of privacy and the contents can be said to be in plain view." *Id*. (internal quotations and citations omitted). Further, when making the "foregone conclusion" determination, the circumstances of the seizure may add to the apparent nature of its contents. *Williams*, 41 F.3d at 197, *citing Blair v. United States*, 665 F.2d 500, 507 (4th Cir. 1981).

Here, the presence of the illicit items in the bag was a foregone conclusion because the detectives had already observed those items going into the bag. And Cunningham's actions – the

initial abandonment, evasion, nervousness, flight, and attempt to conceal – only enhanced both the probable cause and confirmed the contraband's presence in the bag. Even as a technical matter, the *Williams* court explicitly mentioned containers that are not closed, and the bag in this case was not closed, tied, or secured in any way, despite Defendant's contention to that effect. In the video, Det. Ragin appears to manipulate the handles to get a better view, but he does not actually "open" the bag, and it actually would have been hard pressed to maintain security of the bag and its contents without being able to see those contents given the configuration of the bag unless he manipulated it more significantly.

While the detectives had probable cause to arrest Cunningham at the outset and seize and search the bag incident to arrest, Cunningham's actions after the detectives' initial observations not only bolstered that probable cause, but also raised concerns about additional crimes, flight, and the destruction or concealment of evidence.[7]

### C.   Exigent Circumstances Also Justified An Exception to the Warrant Requirement.

As noted above, Cunningham's actions gave rise to significant concerns about the imminent destruction of evidence. Heretofore, the Government has focused largely on Cunningham's actions, assuming for the sake of argument that the cashier was just a regular cashier and Cunningham was just attempting to ditch the evidence in a way to limit officers' access and ensure additional time to flee. But Cunningham's actions also give rise to an alternative inference: that he had reason to believe the cashier would at least help him conceal the item or at worst

---

[7] Significantly, while the original probable cause for Cunningham's arrest was for possession of controlled dangerous substances with the intent to distribute, Cunningham's actions actually caused two potential additional crimes to occur in the presence of the detectives: the Attempted Distribution of the CDS (to the cashier), in violation of Section 5-602 of the Criminal Law Article of the Maryland Code, and the obstruction of justice-like Impairment of Availability of Physical Evidence, in violation of Section 9-307 of the Criminal Law Article of the Maryland Code, which prohibits the destruction, alteration, concealment, or removal of physical evidence that the person believes may be used in a pending or future official proceeding with the intent to impair the verity or availability of the physical evidence in the official proceeding.

actively assist him in destroying the evidence. One of the other exceptions to the warrant requirement is for exigent circumstances, which includes, among other justifications, hot pursuit and preventing the imminent destruction of evidence. *Kentucky v. King*, 563 U.S. 452 (2011). In *United States v. Turner*, the Fourth Circuit outlined five relevant considerations in determining whether exigent circumstances exist: "(1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband." 650 F.2d 526, 528 (4th Cir. 1981), *quoting United States v. Rubin*, 474 F.2d 262, 268-69 (3d. Cir. 1973)(internal punctuation omitted).

    All five of these circumstances were present here to some degree with reference both to the bag and to Cunningham's arrest. The entire encounter – from initial observation to tackling Cunningham – took less than a minute, compared to the hours taking a search warrant would require. The officers' belief that the items would be removed or destroyed was reasonable, since Cunningham had already removed it from their reach twice and was trying to get it to an unknown party behind a physical barrier. Likewise with his arrest, Det. Healey observed him attempting to destroy the remaining vials or conceal them under his person. The danger to the officers with respect to the bag arose more from the size (small) and orientation (with their backs to the door and a limited point of entrance and egress) of the store; for Cunningham's arrest, it was his complete refusal to yield his hands, which were hidden under him, and behavior that was characteristics of an armed person. Cunningham's own behavior – both with respect to the bag and with his headlong flight – showed that he was aware that the police were on his trail. Finally, drugs are the quintessential readily destructible contraband.

**D.     Cunningham's Actual Arrest and the Seizure of the Items Incident to His Arrest Were Also Justified.**

Even if the detectives had not clearly seen the suspected CDS packaged for distribution, Cunningham's unprovoked flight from them in a high crime area alone would be sufficient basis to justify his seizure, which was not effectuated until Det. Healey tackled him. *California v. Hodari D.*, 499 U.S. 621, 626 (1991). In fact, as the Supreme Court noted, "headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. at 124. This is particularly true given the high crime nature of the area and all of the other suspicious behavior detailed herein. Contrary to Defendant's assertion that the bag's contents were the basis of Cunningham's pursuit and arrest, it was actually the visible CDS, Cunningham's intervening behavior, and his headlong flight; even if Cunningham had been successful in ditching the drugs in the shop without Det. Ragin being able to see them, the detectives still would have pursued and arrested him. And by the time Det. Healey tackled him, the gun was in plain view, protruding from the knee of his jeans.

Another well-recognized exception to the warrant requirement is the search incident to an arrest. Where an officer effects a lawful arrest, the officer may, without a warrant, search the arrestee's person and areas or containers within the arrestee's immediate control. *See United States v. Currence*, 446 F.3d 554, 556–57 (4th Cir. 2006). Here, the gun and CDS, both on the ground and on his person, were lawfully seized incident to arrest.

Finally, even if the court suppresses the search and seizure of the bag, the attenuation doctrine mandates that the items recovered from Cunningham at the time of his arrest should not be excluded. In considering whether evidence discovered following unlawful police conduct is nevertheless admissible, the Court considers, among other factors, "the presence of intervening circumstances" and "the purpose and flagrancy of the official misconduct." *Utah v. Strieff*, 136 S.

Ct 2056, 2061-62 (2016). Here, Cunningham's flight and the other circumstances outlined above are classic intervening factors, similar to the discovery of an outstanding warrant in an otherwise unlawful traffic stop. Further, there are so many potential bases for the appropriateness of the officer's actions set forth above that to deem them "flagrant" would not be concordant with the evidence.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully requests that Defendant's Motions to Suppress be denied.

Respectfully submitted,

Robert K. Hur
United States Attorney

By: _____/s/_____
Julie D. Podlesni
Special Assistant United States Attorney
36 South Charles Street, Fourth Floor
Baltimore, Maryland  21201
Phone: (410) 209-4941
Fax: (410) 962-3124

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 11th day of September, 2020, a copy of the foregoing Government's Consolidated Response was served via CM/ECF to all counsel of record.

_____/s/_____
Julie D. Podlesni
Special Assistant United States Attorney